PAUL J. FISHMAN
United States Attorney
DANIEL S. KIRSCHBAUM
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. (973) 645-2847
Fax. (973) 297-2010
daniel.kirschbaum@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. |
| v. | Honorable |
| WOMEN IN SUPPORT OF THE MILLION MAN MARCH, FREDERICA BEY, DELACY DAVIS, and JOHN DOES 1-20, | **COMPLAINT** |
| Defendants. | |

The United States of America, by Paul J. Fishman, United States Attorney for the District of New Jersey, brings this action for statutory and triple damages as well as civil monetary penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*., and to recover damages and other monetary relief under the common law or equitable theories of fraud, unjust enrichment, payment under mistake of fact, breach of fiduciary duty, breach of contract, and civil conspiracy; and for its Complaint states:

### Overview

1.      This action arises out of a plan conceived and executed by the Defendants to misuse federal grant monies and then cover up their actions.

2.      Defendant Women In Support of the Million Man March (WISOMMM) received a grant from the United States Department of Justice, Office of Justice Programs (OJP), Office of Juvenile Justice and Delinquency Prevention (OJJDP) to fund its "Boycott Crime Campaign" (BCC) – a program ostensibly designed to organize and fund after-school activities for at-risk youth in the Newark area.

3.      As a condition of receiving the grant money, WISOMMM promised to spend it only on grant-approved activities, and to carefully account for all expenditures of funds.

4.      Instead of spending the grant money on the BCC, however, WISOMMM and Defendant Frederica Bey used the money to cover unrelated expenses or obligations of the parent organization; they concurrently created fictitious justifications and false documentation to hide their actual use of the grant funds.

5.      WISOMMM and Bey were aided in their efforts by Defendant Delacy Davis, who, while ostensibly helping to organize after-school activities through the East Orange Police Athletic League, assisted WISOMMM and Bey in misspending and mis-accounting for the grant funds, and similarly received grant funds that were used to cover unrelated expenses or obligations of a personal nature.

6.      WISOMMM, Bey, and Davis were additionally aided in their efforts by various currently unidentified agents, associates, employees, or co-conspirators; pending discovery and amendment of this Complaint, such unidentified individuals shall be denoted as John Does 1-20

### Jurisdiction and Venue

7.      This court has jurisdiction over this matter pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. § 1345.

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1391, and 28 U.S.C. § 1395(a).

### Parties

9.      Plaintiff is the United States of America, suing on behalf of the United States Department of Justice (DOJ), its Office of Justice Programs (OJP), Office of Juvenile Justice and Delinquency Prevention (OJJDP), and Office of Inspector General (OIG).

10.     The Office of Justice Programs provides innovative leadership to federal, state, local, and tribal justice systems, by disseminating state-of-the art knowledge and practices across America, and providing grants for the implementation of these crime-fighting strategies. Because states and localities bear most responsibility for crime control and prevention, the federal government can be effective in these areas only to the extent that it can enter into partnerships with state and local law enforcement.  To this end, OJP partners with state and local officials to identify the most pressing crime-related challenges confronting the justice system and to provide information, training, coordination, and innovative strategies and approaches for addressing these challenges.

11.     Office of Juvenile Justice and Delinquency Prevention is a branch of OJP, and works to reduce youth crime and violence through comprehensive and coordinated efforts at the federal, state, and local levels, in part by funding prevention, outreach, and early intervention programs for juveniles and their families.

12.     The Office of the Inspector General conducts independent investigations, audits, inspections, and special reviews of DOJ personnel and programs in order to detect and deter waste, fraud, abuse, and misconduct, and to promote integrity, economy, efficiency, and effectiveness in Department of Justice operations.

13.     Defendant WISOMMM is, according to its own website, "a non-profit community-based organization, created after the Million Man March that took place in Washington, D.C. on October 16, 1995." Its self-described mission is "to create, promote and develop educational, cultural, civic and athletic programs in our society in an effort to enhance and empower the quality of life for the people in the Greater Newark Community"; and its "goals and objectives" are "to take back the streets of our communities, increase health awareness, create affordable housing, focus on economic development, improve the educational system, and increase voter registration."

14.     According to WISOMMM's website, the Boycott Crime Campaign is designed "as a wake-up call to urban communities in particular and to all people in general, to refrain from any and all activities or behavior that could be considered 'criminal' and subject to inevitable short or long-term prison sentences. The ultimate goal of the campaign is to empty jail cells and reduce the American prison population to zero."

15.     According to WISOMMM's website, Defendant Bey has been Executive Director of WISOMMM since its creation in November 1995.

16.     Defendant Delacy Davis is a retired police officer and has served as Director of the East Orange Police Athletic League (EOPAL) since approximately 1998 or 1999. He is also a long-time affiliate of WISOMMM. In 2008 WISOMMM honored him for "educational excellence" at its annual fundraising "African Awards Banquet and Dinner," an event whose prior honorees have included Louis Farrakhan and Sharpe James. In 2010, WISOMMM held a dinner to celebrate his retirement from the East Orange Police Department and honor him for "years of support, courage, dedication and love."

**The False Claims Act**

17.     The False Claims Act, 31 U.S.C. § 3729(a)(1), provides in pertinent part that any person

who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), . . . or (G);
>
> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;
>
> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true; . . . or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

18.     The False Claims Act, 31 U.S.C. § 3729(b)(1) defines "knowing" and "knowingly" to

mean that a person has actual knowledge of certain information, acts in deliberate ignorance of

the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the

information; the Act does not require proof of specific intent to defraud.

19.     The False Claims Act, 31 U.S.C. § 3729(b)(2) defines "claim" as "any request or

demand, whether under a contract or otherwise, for money or property and whether or not the

United States has title to the money or property," which "is presented to an officer, employee, or

agent of the United States" or "is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest," and the Government "provides or has provided any portion of the money or property requested or demanded" or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."

20.     The False Claims Act, 31 U.S.C. § 3729(b)(3) defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."

<u>**The OJP/OJJDP Grant to WISOMMM/BCC**</u>

21.     One type of grant administered by OJP is a an Office of Juvenile Justice and Delinquency Prevention grant, intended to support development and implementation of effective programs for individuals to protect public safety and provide services that address the needs of youths and their families.

22.     On or about September 14, 2005, OJP awarded the BCC Grant No. 2005-JL-FX-0210, in the amount of $345,325.00, for the period of August 1, 2005 until December 31, 2006.

23.     According to the grant's project summary, the "Women in Support of the Million Man March, Inc., seeks to improve academic and conflict resolution skills and reduce juvenile delinquency among Newark, New Jersey youth.  The Boycott Crime Campaign will address gang activity, underage drinking, youth violence and drug abuse among youth ages 8 to 18. Programming will include individual and family counseling, tutoring and mentoring services, as well as cultural workshops and fieldtrips.  Most programming will take place at the African American Education and Cultural Resource Center in Newark, New Jersey."

24.     According to the official letter to Bey announcing the grant had been awarded, OJP noted that the award was "subject to all administrative and financial requirements, including the timely submission of all financial and programmatic reports, resolution of all interim audit findings, and the maintenance of a minimum level of cash-on-hand."

25.     Per the grant award itself, WISOMMM was required to submit quarterly financial reports and semi-annual progress reports.

## Defendants' Misappropriation of Grant Funds

26.     Between January 19, 2006 and December 7, 2006, $274,447.00 in grant funds were removed via check and electronic transfer from WISOMMM's BCC-designated Sovereign Bank account to two other WISOMMM bank accounts.

27.     WISOMMM repaid $77,000.00 of these funds, leaving an unpaid amount of $197,447.00.

28.     These fund transfers were unrelated to the BCC's grant-approved activities.  The original grant program director told federal investigators that before she was removed from her position, she became aware that certain portions of those transferred funds were used to cover WISOMMM's own debts, operating costs, or expenditures.

29.     WISOMMM and Bey have never provided an accounting of how these funds were used or spent.

**Fictitious "Rent" Payments**

30.     In its grant proposal, WISOMMM stated that BCC needed to rent "an administrative office" at WISOMMM's property in Newark, New Jersey.  WISOMMM further stated that "most programming" would occur at this same property.

31.     WISOMMM estimated that BCC would need $99,477.00 in grant funds to cover rent and other expenses related to its facilities.

32.     These rent-related or facilities fees were wildly inflated from the outset, because WISOMMM owned the space free and clear, and there was thus little or no need for BCC to pay "rent" for space within WISOMMM's facilities.

33.     Nonetheless, WISOMMM drafted a lease pursuant to which BCC paid WISOMMM approximately $76,400 in grant funds.  WISOMMM later created a "lease addendum" for approximately $19,000.

34.     The lease between WISOMMM and BCC purported to give the BCC complete and exclusive use and control of WISOMMM property at 15 James Street in Newark.

35.     Yet WISOMMM continued to use that the property primarily for its normal, non-grant-related activities; in particular, WISOMMM continued to use, and charge third parties to use, some or all of this space for banquet or party-type events.

36.     In fact, the BCC had no dedicated space within the WISOMMM facility.  The entire WISOMMM facility was a multi-use property, small portions of which were devoted to BCC activities on occasion, as needed and if available.

**Suspicious Payments to Davis**

37.     WISOMMM also arranged two payments from BCC grant funds to Defendant Davis, with little or no apparent connection to the goals of the BCC grant.

38.     On the first such occasion, in approximately April 2006, WISOMMM paid Davis $4,050.00, but voided the check and issued a subsequent check to the EOPAL in the amount of $4,050.00.

39.     The $4,050.00 was ostensibly paid to Davis as compensation for nine workshops in "conflict resolution" that he had or would conduct for BCC.

40.     In fact, however, Davis billed WISOMMM $4,050.00 for a ten-day "workshops and training" event whose attendees were 26 Bermudans and only about 15 EOPAL youth and staff.

41.     The Bermudans flew into Newark, and were taken to some cultural and sociological events, as well as to restaurants, the movies, an aquarium, shopping trips, a bowling alley, and a professional basketball game.

42.     Not only were these activities largely unrelated to the activities described in the BCC grant and provided primarily to non-local participants, but Davis was also separately compensated for conducting them.

43.     In about October 2006, the Bermuda government paid Davis' private corporation approximately $87,500 for "consulting" with them on gang issues.  This payment was apparently based at least in part on Davis' "work" on the same "workshops and training" for which he received compensation from WISOMMM via the BCC grant.

44.     On the second such occasion, WISOMMM paid Davis $20,000.00.  The EOPAL invoiced $20,000 to BCC, but has not justified the payment of the $20,000 to Davis.

45.     Upon information and belief, Davis used some or all of the BCC funds he received to pay for various gifts and loans to EOPAL, including a June 19, 2006 loan of $13,000; a June 21, 2006 donation of $50,000; a September 28, 2006 loan of $27,900; a December 1, 2006 loan of $2,200; and a December 21, 2006 payment by Davis of a $13,000 tax lien on EOPAL property.

46.     Defendants WISOMMM and Bey have never explained or provided justification for these payments to Davis, or the exact nature of the relationship between Davis, WISOMMM and the EOPAL at the time of such payments.

47.     Davis was subsequently hired to be the principal of the WISOMMM charter school.

**Grant Funds for Dedicated Employees Misused**

48.     BCC, according to its grant application documents, was supposed to have two dedicated employees whose salaries were to be paid using grant funding.

49.     One of these employees, titled "Project Director" was supposed to "work with executive leadership and staff to implement a cohesive and comprehensive youth development program for 50-100 youth ages 8-18" and "provide the program staff with day-to-day supervisory support necessary for them to effectively implement programs."  The Project Director, again according to BCC's grant application, was also responsible for "funding reporting," "grant resubmissions," disbursement of funds to consultants," and "managing performance measure data [*sic*]."

50.     The other designated employee, titled "Program Coordinator" was supposed to "coordinate after-school activities, carrying out the daily schedule of activities," "supervise aides and volunteers," "collect data related to grant reporting, program assessments and outcomes," "conduct studies to assess [the] impact of organizational changes, administration of programs to improve efficiency [*sic*]," and help the Project Director to "ensure the safety of all program participants."  The Program Coordinator was also supposedly responsible for "recruiting youth participants," and "managing Kid Trax software data."

51.     According to the OJP grant, "[t]he Project Director and key program personnel designated in the application shall be replaced only for compelling reasons and with the concurrence of OJP."

52.     Yvonne Onque had worked full-time as the Assistant to the Director of WISOMMM's Childcare Center prior to WISOMMM's receipt of the BCC grant.

53.     After the grant was obtained, Onque was purportedly hired as the BCC "Program Director."  As a defined employee of the grant, Onque's benefits were also paid from the grant funds.

54.     Bey offered Onque the Program Director job via an official letter sent on or about November 9, 2005; the letter mentioned that Onque's starting salary would be $50,000, and that the job included medical and dental benefits.

55.     In reality, however, Onque continued to work nearly exclusively in her capacity as a WISOMMM childcare staffer.

56.     Onque's full salary was paid out of grant funds even though much of her day was spent working for or at WISOMMM's Childcare Center – typically from about 10:00 a.m. until school dismissal in the afternoon.

57.     Onque was also required to show the building's event space to prospective WISOMMM clients.

58.     Onque had an office on the second floor of the WISOMMM facility.  She had this same office before the BCC grant, and continued using it during the BCC grant period.

59.     Onque maintained a single filing cabinet with BCC-related documents, as well as several electronic BCC-related files or documents on her computer.  These documents comprised the entirety of the BCC's administrative records.

60.     Onque's ostensible BCC role included managing BCC's grant funds and controlling routine expenditures.

61.     Yet Bey orchestrated at least two large withdrawals from the BCC grant account – which she apparently spent on expenses unrelated to BCC.

62.    At one point, Bey discovered or feared that WISOMMM would be unable to make payroll – i.e., to pay its non-BCC employees' salaries.

63.    Bey then directed Onque to transfer $40,000 from the BCC grant account to WISOMMM's main bank account, from which payroll would be made.

64.    Onque told Bey that she was not comfortable with the transfer and that Bey had to "fix" the problem created by the transfer of funds.

65.    Bey told Onque to "do this"; Bey also told Onque not to make further inquiries regarding fund transfers from BCC to WISOMMM.

66.    The transfer occurred on January 19, 2006.

67.    Soon after, Onque noticed a bank statement documenting a January 25, 2006 transfer of an additional $50,000 from the BCC grant account to WISOMMM, apparently effected by Bey without Onque's knowledge.

68.    Onque was afraid to question this transfer, in light of Bey's response to her prior inquiry.

69.    On September 14, 2006, Onque separated from the BCC following an angry confrontation with Bey for which the Newark Police Department made an incident report, although no charges were filed.

70.    Onque was not replaced, and her functions were absorbed primarily by Bey.  The residual of Onque's salary and benefits, since she was not replaced, should be accounted for and repaid.

71.    Bey and BCC continued to use purchase orders that Onque signed prior to her separation.

72.    After Onque separated, WISOMMM allegedly commissioned an accountant to perform a review of the BCC's finances, at a cost of $5,000, which was paid in grant funds.

73.     However, there is little or no documentation to support this expense; a February 2, 2009 correspondence from the accountant, one Faheem J. R'Oof, stated:  "No separate written report was issued, which was not in our scope just an oral update at that time."

74.     The only other BCC employee of record was Onque's daughter, Akiba Ismail.  Ismail had worked full-time as a "Family Worker" in WISOMMM's Childcare Center prior to WISOMMM's receipt of the BCC grant.

75.     Upon information and belief, a "family worker" is akin to a social worker, and family worker presence at any child care center is a condition for state funding.

76.     After the grant was obtained, Ismail was purportedly hired as the BCC "Program Coordinator."  As a defined employee of the grant, Ismail's benefits were also paid from the grant funds.

77.     Bey offered Ismail the Program Coordinator job via an official letter sent on or about November 9, 2005; the letter mentioned that Ismail's starting salary would be $35,000, and that the job included medical and dental benefits.

78.     Ismael shared a desk with Amina Bey, Defendant Bey's daughter, in an adjacent office.

79.     Following receipt of the BCC grant, Ismael (like Onque) continued to work primarily in and for WISOMMM's Childcare Center, while being paid exclusively with BCC grant funds.

80.     In fact, one trigger for the confrontation between Onque and Bey was Bey's decision to reprimand Ismael for being late to the "first day of school"; this further indicates that her role remained primarily in WISOMMM's Childcare Center.

81.     Since only a small portion – to be determined at trial – of Onque's and Ismael's time and efforts during the grant period were devoted to BCC, Plaintiff is entitled to recover the remainder of the grant funds dedicated to their wages and benefits.

82.     Further, Plaintiff is entitled to recover the entire portion of the grant covering Onque's and Ismail's wages and benefits for the period following their separation from WISOMMM/BCC.

**Fictitious "Insurance" Payments from Grant Funds**

83.     WISOMMM charged the BCC grant $16,537.43 for one year of insurance in August 2005.

84.     Yet WISOMMM's September 2005 umbrella insurance policy, which covered all of WISOMMM's operations, including the BCC, only cost $13,038.00.

85.     There are no records of any specific policies/endorsements being purchased relative to the BCC grant.

86.     Upon information and belief, the BCC did not purchase any insurance; and WISOMMM never purchased – and was not required to purchase – any additional or different insurance to cover BCC and its activities.

**Funds Dedicated to Technology Misused or Unaccounted For**

87.     According to the grant application documents, BCC needed $5,000 to purchase "Kid Trax" software.  Kid Trax is produced by "nFocus Software," whose website claims that Kid Trax allows "accurate and quick data gathering," and enables users to "capture and maintain basic demographic information such as birthdays, gender and ethnicity or more comprehensive records such as the participation in government assistance programs and insurance status."

88.      The grant application noted that BCC would "train staff to effectively use Kid Trax program measurement system to better track and report the effectiveness of the program and identify weaknesses."

89.     The BCC grant application also sought an additional $8,000 for a printer, identification cards, lanyards, and computer – all of which would be necessary to effectuate the Kid Trax software and actually track, view, share, and analyze the data collected.

90.     In fact, WISOMMM and the BCC never purchased Kid Trax, as Bey has previously admitted to an investigator.

91.     Further, upon information and belief, none of the other amounts itemized for the related equipment was ever spent – at least not on anything related to the activities described in the BCC grant.

92.     However, Davis wrote a $1,448 check to nFocus on August 8, 2006, and notated the check as relating to the "Bermuda Project" described earlier.

**Other Misused or Missing Grant Funds**

93.     WISOMMM also used $2,296.00 in BCC funds to pay for elevator repairs in the WISOMMM facility.

94.     As part of the grant application, BBC's Budget Detail Worksheet included $4,500.00 to compensate "Queen Afua" (born Helen Odel Robinson) for conducting ten lectures on "health and nutrition."  But there is no record suggesting that this money was ever paid to Afua.

<u>**Defendants' Misreporting of Grant Fund Expenditures and BCC Activities**</u>

95.     Defendants not only misspent or misappropriated grant money; they also repeatedly misstated or failed to admit or explain their misspending and other failures to abide by the grant's terms and conditions.

96.     Specifically, in the various financial reports that WISOMMM and/or Bey submitted to OJP, there was no mention of any of the various issues described above – the "rent" and "insurance" payments for space not devoted to BCC, the payments to Davis for questionable

- 15 -

activities, Onque's and Ismail's non-dedication to BCC and their termination and non-replacement, and the unspent funds for technology and health and nutrition lectures.

97.     Further, upon information and belief, WISOMMM and Bey's reports provided inaccurate information about the nature and scope of BCC activities and the number of participants in these activities, and otherwise contained inflated or exaggerated descriptions of BCC events and activities in an effort to mislead OJP about how the grant money was being used.

98.     Had Plaintiffs received the accurate and complete reports required as conditions of the grant, they would have learned of Defendants' various misappropriations and misuses of grant funds much earlier, and would have revoked and terminated the grant.

## COUNT I

### False Claims Act, 31 U.S.C. § 3729(a)(1) – Presenting False Claims

99.     Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 66 as if set forth fully herein.

100.    By submitting inaccurate, incomplete, and misleading grant proposal documents and quarterly financial reports to Plaintiffs, Defendants knowingly presented or caused others to present to an officer, employee, or agent of the United States false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

101.    Specifically, to obtain and maintain the BCC grant, Defendants submitted, or caused to be submitted, false and fraudulent grant applications to DOJ and other related documentation. These documents included a certification that all of the $345,325.00 in grant funds would be administered for the benefit of the intended grant activities in a manner adhering to the submitted grant proposal.

102.    Defendants also falsely and fraudulently submitted acceptances of the special conditions of the grant awards that included strict adherence to the grant's parameters.

103.    Unaware of the foregoing circumstances and conduct of Defendants, the United States awarded the BCC grant and consequently reimbursed BCC or other Defendants for fraudulent and unallowable claims unrelated to the grant's stated purposes.

104.    As a result of these false claims, the United States has incurred actual damages, exclusive of interest and costs, in an amount to be determined at trial.

105.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended, Defendants should be held liable to the United States for three times the amount of actual damages which the United States has sustained because of Defendants' actions, as well as for monetary penalties of $5,500 - $11,000 per each false claim submitted.

**COUNT II**

**False Claims Act, 31 U.S.C. § 3729(a)(2) – Using False Statements**

106.    Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 70 as if set forth fully herein.

107.    By submitting inaccurate, incomplete, and misleading grant proposal documents and quarterly financial reports to Plaintiffs, Defendants knowingly made, used, or caused to be made or used, false records, statements, or certifications to get false or fraudulent claims paid or approved by the government.

108.    Specifically, to obtain and maintain the BCC grant, Defendants submitted, or caused to be submitted, false and fraudulent grant applications to DOJ and other related documentation. These documents included a certification that all of the $345,325.00 in grant funds would be

administered for the benefit of the intended grant activities in a manner adhering to the submitted grant proposal.

109.     Defendants also falsely and fraudulently submitted acceptances of the special conditions of the grant awards that included strict adherence to the grant's parameters.

110.     Unaware of the foregoing circumstances and conduct of Defendants, the United States awarded the BCC grant and consequently reimbursed BCC or other Defendants for fraudulent and unallowable claims unrelated to the grant's stated purposes.

111.     As a result, the United States incurred actual damages, exclusive of interest and costs, in an amount to be determined at trial.

112.     Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended, Defendants should be held liable to the United States for three times the amount of actual damages which the United States has sustained because of Defendants' actions, as well as for monetary penalties of $5,500 - $11,000 per each false claim submitted.

## COUNT III

### False Claims Act, 31 U.S.C. § 3729(a)(7) – Using False Records to Avoid Refund Obligation

113.     Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 77 as if set forth fully herein.

114.     Defendants knowingly caused to be made or used false records or false statements, *i.e.*, the false certifications and representations submitted to Plaintiff in the form of a fraudulent lease and lease addendum between WISOMMM and the BCC, the fraudulent claim of insurance expenses on behalf of the BCC, EOPAL time and attendance payroll data that purported to justify a $20,000 payment to Defendant Davis, and quarterly Financial Status Reports, in order to

conceal, avoid, or decrease WISOMMM and/or the BCC's obligation to repay or return grant funds that were misspent or not used as required under the terms of the grant.

115.    As a result, the United States incurred actual damages, exclusive of interest and costs, in an amount to be determined at trial.

116.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended, Defendants should be held liable to the United States for three times the amount of actual damages which the United States has sustained because of Defendants' actions, as well as for monetary penalties of $5,500 - $11,000 per each false claim submitted.

**COUNT IV**

**<u>Common Law Fraud</u>**

117.    Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 81 as if set forth fully herein.

118.    Defendants caused to be made material and false representations in grant-related submissions, with knowledge of their falsity or reckless disregard for their truth, and with the intention that the United States would act upon the misrepresentations to its detriment.

119.    The United States acted in justifiable reliance upon misrepresentations caused to be made by Defendants by providing grant funds to BCC based on the misrepresentations.

120.    Had the true facts been known to the United States, the United States would not have provided grant funds to BCC.

121.    By providing these grant funds to BCC, the United States incurred actual damages, exclusive of interest and costs, in an amount to be determined at trial.

## COUNT V

### Unjust Enrichment

122.    Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 86 as if set forth fully herein.

123.    By directly or indirectly obtaining government funds to which they were not entitled, Defendants were unjustly enriched, and should be liable to account for and pay to Plaintiff such amounts, or the proceeds therefrom, which are to be determined at trial.

## COUNT VI

### Payment Under Mistake of Fact

124.    Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 88 as if set forth fully herein.

125.    The false claims that Defendants caused to be submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

126.    The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of the certifications and representations caused by Defendants, paid certain sums of money to Defendants, to which they were not entitled and should thus be liable to account for and pay back, in an amount to be determined at trial.

## COUNT VII

### Breach of Fiduciary Duty

127.    Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 91 as if set forth fully herein.

128.    This is a claim for the recovery of federal monies paid to Defendants due to their breach of fiduciary duties with respect to those monies.

129.     The United States, in its capacity as grantor, acted as a principal, and Defendants WISOMMM and Bey, in their capacity as grantees, acted as an agent of the United States for the purpose of expenditures of federal funds.

130.     The United States provided grant funds to WISOMMM/BCC for authorized uses, and Defendants WISOMMM and Bey had a fiduciary duty to use such funds in an authorized manner, in accordance with all applicable laws and regulations, and with a full accounting to the United States of the use of such funds.

131.     Defendants WISOMMM and Bey violated their fiduciary duties to the United States regarding the use of these federal funds.

132.     As a result, the United States incurred actual damages, exclusive of interest and costs, in an amount to be determined at trial.

## COUNT VIII

### Breach of Contract

133.     Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 97 as if set forth fully herein.

134.     Defendants WISOMMM and Bey materially breached the terms of the BCC grant by misspending and misappropriating grant funds, and by failing to provide full, accurate, and truthful accountings of their use or misuse of the funds as required by the express terms of the grant.

135.     The United States, unaware of the foregoing circumstances, awarded the initial grant and made subsequent grant payments to BCC through WISOMMM as agreed in the grant award.

136.     By reason of these breaches, the United States has been damaged, and Defendants should be liable to account for and pay such amounts, to be determined at trial, to the United States.

## COUNT IX

## <u>Civil Conspiracy</u>

137.    Plaintiff repeats and re-alleges each allegation set forth above in paragraphs 1 through 101 as if set forth fully herein.

138.    Defendants have conspired and continue to conspire to obtain under false pretenses, misappropriate, misspend, and fail to account for their misuse of, the BCC grant funds.

139.    As a direct and proximate result of the conspiracy, Plaintiff suffered harm by paying, and then failing to recover, grant money to which Defendants were not entitled.

140.    By reason of this conspiracy, the United States has been damaged, and Defendants should be liable to account for and pay such amounts, to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States requests that judgment be entered in its favor and against Defendants jointly and severally as follows:

1.    On the First, Second, and Third Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Fourth Count, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

3.    On the Fifth, Sixth, and Seventh Counts for unjust enrichment, payment by mistake, and breach of fiduciary duty, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus

interest, costs, disgorgement, an accounting, imposition of a constructive trust and such further relief as may be just and proper.

4.      On the Eighth Count, for breach of contract, for the damages sustained by the United States plus interest.


Dated:  January 24, 2012

                                            Respectfully submitted,

                                            PAUL J. FISHMAN
                                            United States Attorney

                                             */s/ Daniel S. Kirschbaum*
                                    By:      DANIEL S. KIRSCHBAUM
                                            Assistant U.S. Attorney
                                            Attorney for Plaintiff